# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 29, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0335-MR

LAVERN GRAY                                        APPELLANT

V.              ON APPEAL FROM KNOX CIRCUIT COURT
HONORABLE GREGORY ALLEN LAY, JUDGE
NO. 18-CR-00109

COMMONWEALTH OF KENTUCKY                  APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

The trial court sentenced Lavern Gray to imprisonment for two consecutive ten-year sentences following a trial in which the jury convicted him of first-degree rape and first-degree sodomy. Gray appeals that judgment as a matter of right.[1]

Gray argues the trial court's failure to grant his for-cause challenge to strike a police officer from the venire cost him a peremptory challenge during jury selection, denying him of his right to an impartial jury. He also argues palpable error occurred when the Commonwealth misrepresented the evidence against him by stating in closing argument that the forensic evidence "contained [Gray's] DNA." We find no error in the trial court's decision to deny

---

[1] Ky. Const. § 110(2)(b).

the for-cause challenge, and, although the prosecutor's statement in closing argument improperly characterized the DNA evidence, no palpable error occurred. We affirm the judgment.

## I. FACTUAL BACKGROUND

T.B. and Gray's granddaughter were friends. T.B often accompanied her to Gray's house where the two girls played and helped Gray tend to his animals.

On one occasion when T.B. and the granddaughter were visiting Gray's home, T.B. was left alone with Gray inside the home. On that occasion, T.B. alleges Gray made suggestive comments to her about his private parts, telling her that she was beautiful and needed a man like him. She claimed that Gray gave her a drink that made her feel dizzy. Then, Gray pressed his weight on her so she could not move and licked her vagina. After this, T.B. alleges that Gray forced vaginal intercourse with her. She described that when he completed intercourse, he wiped his penis on a red rag.

T.B. told the jury that upon returning home from the encounter with Gray, she showered and placed her clothes into the washing machine to soak. The next day, she told both her mother and Timber about the encounter with Gray. Her mother then called the police. The investigating officer with the Kentucky State Police (KSP) came to T.B.'s house and collected her clothes from the washing machine. He also collected a DNA sample from Gray and found red rags and sleeping pills in Gray's home.

2

## II. ANALYSIS

### A. The trial court did not err in refusing to strike Juror 253 for cause.

Gray contends that he was denied his right to an impartial jury because the trial court refused to strike Juror 253 for cause.[2] During voir dire, Juror 253 disclosed that he was a city police officer and had cases actively prosecuted by the same office prosecuting the case at hand. Additional voir dire questioning disclosed that Juror 253 knew the KSP officers and attorneys working on the present case. Juror 253 stated that he would be able to remain impartial as a juror despite his employment and familiarity with the parties involved.

Defense counsel moved to strike for cause Juror 253 as a prospective juror, arguing that Juror 253 would be unable to remain impartial because he was regularly employed in law enforcement as an agent of the Commonwealth. The trial court denied the motion, ruling that Juror 253 was not an agent of the Commonwealth simply because of his employment with a local city's police department, Juror 253 had stated his ability to serve impartially, and defense counsel had cited no legal authority to support the argument that police officers are automatically disqualified from service as petit jurors in criminal trials. Defense counsel properly preserved this issue for appeal by designating on the peremptory strike sheet the jurors he would have struck had the peremptory strike been available to him.[3]

---

[2] U.S. Const. amend. VI, XIV; Ky. Const. amends. XI.

[3] *Ward v. Commonwealth*, 587 S.W.3d 312, 327 (Ky. 2019) ("To complain on appeal that a party was forced to use one of the party's peremptory challenges because

This Court reviews for abuse of discretion a trial court's refusal to strike a potential juror for cause, giving deference to the trial court's involvement in the jury-selection process in real time.[4] Although we typically review for abuse of discretion under the harmless-error standard, when a substantial right is affected, such as the right to an impartial jury, we will reverse if the trial court erred, because prejudice is presumed.[5]

Kentucky Rule of Criminal Procedure (RCr) 9.36 requires a prospective juror to be dismissed when there is "a reasonable ground to believe that the juror cannot render a fair and impartial verdict on the evidence." A juror's ability to decide a defendant's guilt or innocence impartially is adjudged by the entirety of the juror's voir dire responses and demeanor.[6] Ostensible doubt as to impartiality does not require a prospective juror to be dismissed, but when the prospective juror shares a close relationship, "be it familial, financial or situational, with any of the parties, counsel, victims or witnesses,"[7] the trial court may dismiss the juror for cause."[8] Overall, a trial court's decision to

---

of the trial court's erroneous failure to grant a for-cause strike, the defendant must use a peremptory strike on that juror *and show that the peremptory strike was used on their strike sheet."*). Gray used nine peremptory strikes and noted that he would have struck Juror 326 if his motion to strike Juror 253 had been granted.

[4] *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007).

[5] *Ward*, 587 S.W.3d at 327–28 ("As such, harmless error analysis is not appropriate, and prejudice is presumed.").

[6] *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 196 (Ky. 2017).

[7] *Marsch v. Commonwealth*, 743 S.W.2d 830, 833 (Ky. 1988).

[8] *Whittle v. Commonwealth*, 352 S.W.3d 898, 901 (Ky. 2011).

strike a juror for cause is a case-by-case decision determined by the prospective juror's responses to questions during voir dire.[9]

This Court has held that employment as a police officer does not carry with it a presumptive bias that necessitates automatic disqualification; additional circumstantial information is required.[10]  In *Brown v. Commonwealth* we discussed a prospective juror's arguable inability to be impartial simply because of her employment as a police officer.[11]  In *Brown*, the prospective juror worked as a police officer, and her work brought her into regular contact with the Commonwealth's Attorney's Office and KSP.[12]  She had experience as a federal law enforcement officer, had taught other agents investigation techniques and how to give testimony in court, and her father and brother had both worked as law enforcement officers.[13]  But despite these facts that cast ostensible doubt on her ability to decide impartially in a criminal prosecution, she also told the trial court she would be able to "assess the credibility of police officers as she would any other witness," that she knew that police officers could testify falsely or mistakenly, and "that her training had

---

[9] *Brown v. Commonwealth*, 313 S.W.3d 577, 596 (Ky. 2010) ("In making this determination, the trial court is to consider the prospective juror's voir dire responses as well as his or her demeanor during the course of voir dire and is to keep in mind that generally it is the totality of those circumstances and not the response to any single question that reveals impartiality or the lack of it. 'Impartiality,' we reiterated recently in *Shane v. Commonwealth,* 243 S.W.3d 336, 338 (Ky. 2007), 'is not a technical question but a state of mind.'").

[10] *Id.* at 597.

[11] *Id.*

[12] *Id.*

[13] *Id.*

impressed upon her the importance of treating an officer's testimony no differently than anyone else's."[14]  We upheld the trial court's decision to not strike the police officer for cause in *Brown* because she indicated her ability to remain impartial and did not share a close relationship with any of the actors in the case.

Gray contends that because Juror 253 had a working relationship with the Commonwealth's Attorney's Office prosecuting his case, the trial court was required to strike the juror for cause.  In *Fugate v. Commonwealth*,[15] we held that two venire persons should have been stricken for cause because of their prior professional relationship with the prosecuting attorney.  For example, in *Fugate*, the prosecutor had prepared legal documents for one prospective juror who was a satisfied client and willing to retain the prosecutor again for legal work.[16]  The other prospective juror in *Fugate* expressed satisfaction and had a current first-name-basis relationship with the prosecutor who was contemporaneously prosecuting a case in which the victim of the crime was the business the prospective juror managed.[17]  We held as error the trial court's refusal to strike these potential jurors for cause because of their prior and potential future professional relationships with the same attorney prosecuting the case on trial.[18]

---

[14] *Id.*

[15] 993 S.W.2d 931, 938 (Ky. 1999).

[16] *Id.*

[17] *Id.* at 938–39.

[18] *Id.* at 939.

We find the circumstances here more like those in *Brown*. Juror 253 was employed at a local police department. Through that employment, he had a relationship with the office prosecuting the present case. In his role with the police department, Juror 253 investigated crimes and brought them to the attention of the Commonwealth's Attorney's Office. At the time of the trial, Juror 253 had some active cases with the Commonwealth's Attorney's Office. Importantly, Juror 253 indicated that his employment would not cause him to "lean one way or another."

While Juror 253 had pending prosecutions being handled by the Commonwealth's Attorney's Office, so would any police officer with cases currently being prosecuted by the state. No elicited information in voir dire suggested Juror 253 had any special relationship with anyone employed by the Commonwealth's Attorney or with the attorney prosecuting the case at hand.

In *Brown*—a case in which trial venue had been changed—the juror had routine contact with the Commonwealth's Attorney's Office in the county where the case was being tried, but the team prosecuting Brown at trial were from outside the trial venue.[19] In this case, Juror 253 had active cases with the same office prosecuting Gray, but the special relationships noted in *Fugate* are absent here. The trial court did not abuse its discretion by denying Gray's motion to strike Juror 253.

---

[19] 313 S.W.3d at 588.

## B. Gray was not denied a fair trial by the Commonwealth's Attorney's statement during closing argument.

Gray argues improper statements by the Commonwealth's Attorney in closing argument denied him a fair trial. This issue was not preserved by a contemporaneous objection. This Court generally does not review unpreserved errors.[20] But when the alleged error has potential constitutional implications, such as the denial of due process Gray asserts here, we will review for palpable error under RCr 10.26.[21] Still, we will only reverse the judgment of the trial court if the alleged misconduct by the Commonwealth's Attorney is flagrant and caused a gross injustice to the defendant.[22]

In deciding if prosecutorial misconduct is flagrant, this Court undertakes a four-part analysis.[23] First, we decide if the prosecutor's remarks tended to mislead the jury or prejudice the accused.[24] Second, we consider whether the remarks were isolated or extensive.[25] Third, we determine whether the comments were deliberately or accidentally placed before the jury.[26] And

---

[20] RCr 10.26.

[21] *Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013) ("Under RCr 10.26, an unpreserved error may generally be noticed on appeal if the error is 'palpable' and if it 'affects the substantial rights of a party.'").

[22] *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

finally, we evaluate the comments in light of the strength of the evidence against the accused.[27]

The Commonwealth presented expert testimony about the DNA found on T.B.'s underwear. The testimony from several members of the KSP laboratory included information meant to assist the jury in deciphering the statistical meaning of DNA tests and how the tests assist criminal investigations. The testimony further provided that lab analysis of T.B.'s underwear produced results showing DNA from two males. The testimony explained that the DNA of the second profile contributed larger amounts of DNA than the first, that the second profile matched that of Gray and his paternal relatives, and that there was a 1:891 chance of randomly selecting any given male from within the United States population that would have the same profile as Gray. Based on this evidence, the Commonwealth's Attorney stated during closing argument that the victim's underwear "contained the defendant's DNA." Gray argues this was flagrant prosecutorial misconduct because no testimony confirmed it was his DNA on the victim's underwear.

In *Duncan v. Commonwealth*[28] we discussed a prosecutor's improper comments regarding DNA testing and its significance. *Duncan* involved similar expert testimony about DNA evidence collected and used against the defendant.[29] The testimony in *Duncan* was that the DNA analysis of the

---

[27] *Id.*

[28] 322 S.W.3d 81, 92–93 (Ky. 2010).

[29] *Id.* at 92.

sample collected from the defendant produced inconclusive results.[30]  In sum, the testimony included that neither the defendant nor any other male in the defendant's lineage could be ruled out as the perpetrator.[31]  No further testimony was given explaining the significance of the DNA evidence.  Despite the testimony relaying inconclusive results, the Commonwealth's Attorney in closing stated, "What was the defendant's DNA doing in the victim's panties?"[32]

We held the statement resulted in reversible error, not solely because of the statement itself, but also because the statement lacked an evidentiary basis given the statistical meaning of the DNA evidence.  The DNA evidence was statistically inconclusive, indicating the defendant could have been the perpetrator but in a way equally "consistent with a scenario in which any other man on the planet was the perpetrator."[33]  We found this to be a type of non-exclusion evidence that courts must scrutinize to avoid its tendency to mislead the jury.  We explained in *Duncan*, that merely stating a defendant's DNA matches what was found at the crime scene is "meaningless, or, at most,

---

[30] *Id.*

[31] *Id.* ("The problem is not that the evidence failed to establish a match between Duncan's profile and the profile obtained from the sample. The evidence established a match, or a partial match, at ten of the seventeen tested sites. But missing from the Commonwealth's proof was any testimony establishing the significance of that partial match. Johnson's testimony that Duncan could not be excluded as a source of the panty DNA said nothing at all about how likely or unlikely it was for such a partial match to occur, and most assuredly it did not say that Duncan was the source. By asking the jury to infer on the basis of Johnson's testimony that he was, the prosecutor sought to wring from that testimony a conclusion it could not reasonably yield.").

[32] *Id.*

[33] *Id.*

10

of marginal value" without "further evidence putting the match in some context of significance, statistical or otherwise," because it does not exclude any potential defendant, but only includes them among the rest of the population as a potential source of the DNA.[34] "Without the accompanying evidence . . . the jury ha[s] no way to evaluate the meaning of the result."[35] As a result, we found the Commonwealth's Attorney's statement that the DNA evidence conclusively proved it matched the defendant to be so improper as to warrant reversal.

But the circumstances in Gray's trial are not like those in *Duncan*. The Commonwealth's Attorney in this case undoubtedly overstated the strength of the DNA evidence, which was not conclusive that Gray's DNA was on the victim's underwear.[36] But as we discussed in *Duncan,* to determine the effect the statement had on the jury, we consider not only the improper statement about the DNA evidence but also any testimony about the statistical significance of the DNA evidence that was also given. Here, the jury heard the overblown statement after hearing extensive testimony about the significance of DNA analysis, specifically that there was an 891 to 1 chance of another male in the United States having the same profile as Gray. And defense counsel's

---

[34] *Id.*

[35] *Id.*

[36] *Id.* at 93 ("Whatever avenue is chosen; the Commonwealth must abide by the limitations of its own proof and not make claims that its DNA evidence is more probative than the expert's testimony has shown it to be.").

cross-examination revealed to the jury that the probability of someone else having this Y-STR profile was greater than other kinds of DNA tests.

To be clear, we do not approve of the Commonwealth's Attorney's overstatement of the strength of the DNA evidence, but we find the conduct was not flagrant. The improper statement was made immediately preceding the Commonwealth's Attorney's recital of the DNA analysis report, again reminding the jury of the statistical meaning of the evidence.[37] While the statement could mislead the jury, it was isolated and was only said once during closing argument. This Court cannot determine if the statement was deliberately placed before the jury. But it was a single, brief statement and the Commonwealth's Attorney did not state that the experts found the DNA evidence to be conclusive, but only overstated the significance of the findings.

We finally consider the improper statement in connection to not only the DNA evidence but to all the evidence presented at trial. Gray was charged with first-degree assault and sodomy. T.B. testified that Gray gave her a drink that made her feel dizzy, that he pressed his weight upon her so she could not move away, that he pulled down her leggings and underwear, and then he leaned down and licked her vagina. T.B. further told the jury she told Gray no and shook her head but because she was pinned down she could not escape. She

---

[37] Commonwealth's Attorney: "But the other thing is [T.B's underwear] contained the Defendant's DNA . . . the Defendant has made an interesting argument but I want to say . . . . I've told you this in beginning and I read you this and I'm going to read this to you again. This is what the lab report itself said 'That a match is 891 times more likely to occur if the contributor is Lavern Gray or another paternal relative than if the source is a randomly selected male from the United States population.'"

12

also testified that after this, Gray proceeded to have vaginal intercourse with her, that she continued to say no, and when he was done he wiped his penis with a red rag and pulled T.B.'s pants and panties back up.

At trial, evidence also included that the red rags and sleeping pills were found at Gray's home. Dr. Melissa Haddix, who performed a sexual assault exam on T.B., testified that blood was found in the vaginal vault, despite T.B.'s lack of menstruation, but that there were no tears or forcible damage in the vagina. Haddix testified that because there was no active hemorrhaging she could not ascertain the source of the blood. And as previously discussed, the prosecutor's improper closing statement was made after the jury heard both direct and cross-examination testimony addressing the statistical significance of the DNA evidence.

Even if the weight of the DNA evidence was overstated by the prosecutor, we find that the prosecutor's statements did not have such an impact on the jury as to affect the outcome at trial. In a single brief sentence, the Commonwealth's Attorney overstated the conclusiveness of the DNA evidence. But the statement did not allege that the expert testimony about Gray's DNA was incorrect nor did the Commonwealth's Attorney state the experts found the DNA evidence to be conclusive. The prosecutor here overstated the evidence in closing argument, but such statement did not result in injustice.

### III.  CONCLUSION

For the reasons stated, we affirm the judgment.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Erin Hoffman Yang
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General

Jenny Lynn Sanders
Assistant Attorney General