**John MILLER, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000340–MR.

Supreme Court of Kentucky.

Feb. 21, 2013.

---

Robert Chung–Hua Yang, Assistant Public Advocate, Appellate Division, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, David Wayne Barr, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant was convicted of numerous counts of incest, rape and sodomy for his sexual relationship with his two minor stepdaughters, M.P. and C.P. Appellant raises three issues on appeal: (1) prosecutorial misconduct, (2) an *ex post facto* violation, and (3) the incorrect imposition of court costs and a partial public-defender fee. The Court holds that *ex post facto* principles which impact due process require resentencing for his incest convictions as to victim M.P., and that the trial court erred in levying costs and fees on Appellant. The Court affirms all of Appellant's convictions, remands to the trial court for resentencing consistent with this opinion, and vacates all costs and fees.

## I. Background

M.P. and C.P. were Appellant John Miller's minor stepdaughters. Allegations of sexual abuse started when C.P. accused another man, Roy Cox, of raping her. A month later M.P. also accused Cox, one of Appellant's friends, of sexual abuse. A few weeks later, as police continued to investigate the allegations against Cox, M.P. claimed that other people had abused her as well, including Appellant, her mother Cynthia Miller, and another man named Bill Polston. She also claimed that her mother was present when Appellant sexually abused her. Additionally, C.P. claimed that Appellant had raped her once when she was thirteen years old.

Cynthia Miller was arrested for her role in the alleged incidents. She was interviewed by Kentucky State Police trooper Jonathan McChesney and told the officer that Appellant had sex with M.P. "too many times to count." The tape from this interview was played at trial. During the interview, Trooper McChesney stated to Cynthia that he believed that M.P. and C.P. were telling the truth and that there was no way a jury or anybody else would not believe them, and that Appellant, as the girls' stepfather, was the one who deserved the punishment, more than Bill Polston or Roy Cox. Cynthia told the trooper that she believed that there were nude photos taken of M.P. in their home.

Based on this information, as well as information he had obtained through his investigation that the girls had been shown pornographic videos by their parents, the trooper obtained a search warrant for Appellant's home. During the search, Trooper McChesney found pictures of "extremely young looking girls" from a pornographic magazine entitled "Amateurs Do It All Just For You." A photo of the magazine was admitted at trial by the Commonwealth. Trooper McChesney also found two rolls of undeveloped film, three disposable cameras, and a digital camera, but did not find any nude photos of M.P. or C.P. anywhere. However, from the undeveloped film he found a picture of Appellant in bed with a topless Cynthia Miller beside him. Trooper

McChesney testified that he was concerned with this photo because it was on a roll of film that also contained pictures of M.P. and C.P., though those pictures were not inappropriate. He also stated that it appeared that someone else had to have taken the picture of Appellant and his wife. This photo was also admitted at trial by the Commonwealth.

On February 17, 2009, Appellant John Miller was indicted by the Hart County grand jury on 182 counts of second-degree rape, 182 counts of complicity to second-degree rape, one count of second-degree sodomy, one count of complicity to second-degree sodomy, 183 counts of incest, 183 counts of complicity to incest, one count of second-degree sexual abuse, and one count of complicity to second-degree sexual abuse. The Commonwealth proceeded to trial on only nine counts: three counts of second-degree rape, one count of second-degree sodomy, four counts of incest, and one count of second-degree sexual abuse.

At trial, Roy Cox testified that Appellant had told him that Cynthia was not having sex with him, but that M.P. and C.P. "were hot, sexy, and ready." He also testified that Appellant told him that "he had no problem getting all the sex he wanted" and that Appellant was teaching the girls how to "pole dance" and "strip."

Appellant testified on his own behalf that he never had sex with M.P. or C.P., never watched the girls strip or do pole dances, and did not own any pornography.

At the end of the Commonwealth's case-in-chief, it moved to dismiss one rape count, one incest count, and the second-degree sexual abuse count. The trial court ultimately instructed the jury on one count of second-degree rape, one-count of second-degree sodomy, and two counts of in-

cest involving M.P.; and one count of second-degree rape and one count of incest involving C.P. Appellant was convicted for third-degree rape and third-degree sodomy of M.P. as lesser-included offenses, but otherwise was convicted of all remaining counts. His sentences were run consecutively for a total of seventy years in prison.

This appeal followed as a matter of right to this Court. *See* Ky. Const. § 110(2)(b). Additional factual background will be provided below.

## II. Analysis

Appellant raises three issues on appeal. First, he claims that the Commonwealth engaged in prosecutorial misconduct by improperly questioning witnesses. Second, he claims that the trial court used the wrong penalty range for his sentencing as to the two incest convictions, which he argues violated the Ex Post Facto Clause of the United States and Kentucky constitutions. Third, Appellant claims that the trial court erred in levying court costs and partial public-defender fees on him because he was indigent, and that the trial court erred in ordering a review of court costs and public defender fees upon his release from prison.

### A. Prosecutorial Misconduct

Appellant claims generally that the Commonwealth committed prosecutorial misconduct when it asked a number of questions to a number of witnesses, including Appellant on cross-examination, that elicited irrelevant and unduly prejudicial information that rendered his trial fundamentally unfair. Appellant points to seven specific instances as grounds for reversal of his convictions.[1]

---

1. Appellant claims the following: (1) that the trial court erred in admitting the pornograph-

ic magazine discovered at Appellant's residence; (2) that the trial court erred in admit-

■ Appellant concedes that all of these issues are unpreserved, and as such the Court is obliged to review for palpable error. A palpable error is one that "affects the substantial rights of a party" and will result in "manifest injustice" if not considered by the court. RCr 10.26. This Court has clarified that the key emphasis in defining such a palpable error under RCr 10.26 is the concept of "manifest injustice." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006). "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.*

It should be noted that all but one of Appellant's claims of prosecutorial misconduct (discussed below) are better classified as claims that the trial court committed evidentiary error by admitting irrelevant and unduly prejudicial evidence. While Appellant correctly cites *Duncan v. Commonwealth,* 322 S.W.3d 81 (Ky.2010), for the proposition that "prosecutorial misconduct can assume many forms, including improper questioning and improper closing argument," *id.* at 87, that case dealt with a witness being forced to characterize another witness specifically as "lying" and to testify as to the truth or falsity of DNA evidence. Appellant's claims on appeal do not focus on whether the Commonwealth's conduct was inappropriate, but rather on whether the trial court erred by admitting certain evidence at trial.

While this is not to say that the trial court did not err in admitting some of this evidence, none of the claims resulted in a "manifest injustice," and thus any error was not palpable. Even assuming that the court committed all the complained of evidentiary errors, there is simply no showing of a probability of a different result here. Rather, Appellant's arguments focused on prejudicial error rather than manifest injustice and, given the victims' testimony, he makes no argument that the result would be different absent these evidentiary errors. This Court cannot find that the Appellant's trial was so manifestly unjust that a different result would have occurred absent the alleged errors, and we will not speculate what the result might have been had the alleged errors been preserved.

■ However, one of Appellant's claims—that the Commonwealth "forced" him to testify that he knew nothing about M.P. and C.P. "pole dancing" or "stripping," and that he did not own or watch any pornography—differs from the other claims. This claim is the only one that remotely resembles a typical prosecutorial misconduct claim, because it focuses on the Commonwealth's behavior and not the propriety of the evidence itself. Appellant argues that he was compelled to essentially call the other witnesses "liars," without necessarily using that magic word. He asserts that because the Commonwealth asked questions that spawned answers conflicting with prior testimony from other

---

ting a photograph of Appellant in bed with his topless wife; (3) that the trial court erred in allowing testimony by Cynthia Miller that she believed that there were nude photographs of M.P. on a digital camera in the home; (4) the trial court erred by allowing the Commonwealth to play an interview between Trooper McChesney and Cynthia Cooper where the trooper stated that he believed Appellant was more deserving of punishment than Bill or Roy Cox because he was the victims' stepfa-

ther; (5) that in the same interview Trooper McChesney stated that the victims were telling the truth and that a jury would certainly believe them; (6) that the trial court allowed testimony that Appellant taught the victims how to "pole dance" and "strip" to make money in show business; and (7) that the Commonwealth "forced" Appellant to say that the victims never did any dances for him nor did he teach them to do so and that he did not own or watch any pornography.

witnesses, the prosecutor committed misconduct that rendered his trial unfair.

The professional ethics rules provide the underlying basis for permissible and impermissible prosecutorial conduct. The 2009 Supreme Court Commentary to SCR 3.130(3.8) underscores these principles: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." More specifically, the U.S. Supreme Court stated in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he *should do so.* But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. 629; *see also Commonwealth v. Mitchell,* 165 S.W.3d 129, 132–33 (Ky.2005) ("While it is the duty of the prosecutor to advance the Commonwealth's case with persuasiveness and force, he or she has a concomitant duty not to derogate from a fair and impartial criminal proceeding."); *Caudill v. Commonwealth,* 374 S.W.3d 301, 309 (Ky.2012) (quoting *Berger,* 295 U.S. at 88, 55 S.Ct. 629).

While it is true that Appellant's answers were contrary to testimony presented through other witnesses at trial, he was not "forced" to testify to anything at all. He took the stand on his own volition and told his side of the story. Admittedly, we have held that it is improper for a prosecutor to ask a question that requires a defendant to say that other witnesses were liars or were lying. *See Duncan,* 322 S.W.3d at 88 (discussing the difference between calling other witnesses "wrong" and stating that they are "liars"). That determination is the sole province of the jury. But that is not what happened here. Appellant does not assert that the Commonwealth asked him whether the other witnesses were lying or other similar questions. That his testimony did not align with the testimony of other witnesses is not what *Duncan* and similar cases are about.

The Commonwealth's questioning does not rise to the level of prosecutorial misconduct. Actually, it was perfectly proper, and is one of the risks a defendant faces when he takes the stand. Indeed, if the Commonwealth offers sufficient proof to avoid directed verdict, it seems inevitable that a defendant taking the stand will have to tell a story that is contradicted to some degree by other testimony. The Commonwealth did not commit error, much less palpable error.

**B. Sentencing**

The Appellant also argues that his sentence violated the prohibition on ex post facto laws because it applied a sentencing range that did not exist when some of his crimes were committed.

**1. *Ex Post Facto and Due Process***

Specifically, Appellant claims that his two convictions for Class B incest against

M.P. were in violation of the Ex Post Facto clauses of the United States and Kentucky constitutions because the jury instructions as written resulted in convictions for Class B incest, even though that penalty level was the result of a statutory amendment in the middle of the period of time in which the offenses were alleged to have occurred. During part of that time period, the incest statutes only allowed conviction of a Class C felony. Thus, Appellant argues that if the jury had believed that he committed offenses during that time, he could only be sentenced to a Class C penalty. It is only if the jury believed he committed the offenses *after* the statute was amended to increase the penalty range that he could be convicted of Class B incest. As written, the instructions do not make that distinction, and there is no way to know whether the jury convicted him of a Class C or a Class B incest offense.

■■ This issue is unpreserved, so ordinarily this Court would review it only for palpable error. Sentencing issues, however, are excepted from this rule. Such issues are "not waived by the failure to object at the trial court level." *Jones v. Commonwealth,* 382 S.W.3d 22, 27 (Ky. 2011). "[A]n appellate court is not bound to affirm an illegal sentence just because the issue of the illegality was not presented to the trial court." *Id.; see also Wellman v. Commonwealth,* 694 S.W.2d 696, 698 (Ky.1985).

Prior to July 12, 2006, incest was a Class C felony in all circumstances under KRS 530.020. The statute was amended on July 12, 2006 to make incest a Class B felony if committed on a victim who is less than eighteen years of age. KRS 530.020(2)(b). Incest remains a Class C felony where both parties are consenting adults. KRS 530.020(2)(a).

Both jury instructions as to the victim M.P. permitted the jurors to convict if they believed beyond a reasonable doubt that Appellant had committed the act "sometime between January 1, 2005 and November 30, 2007," a time period that bracketed the date of the July 12, 2006 amendment to KRS 530.020. Thus, if the jury unanimously agreed that Appellant committed the offense between January 1, 2005 and July 12, 2006, it only could have convicted him for Class C incest. If the jury found that Appellant committed the act between July 12, 2006 and November 30, 2007, however, it could have convicted him of Class B incest, provided it also made the additional finding that M.P. was under the age of 18. But the jury was not required to distinguish between those two discrete time periods (e.g., by instructing on them separately); rather, they were required to consider the time frame as a whole. Thus, there is a danger that the Class B felony penalty range has been applied in an *ex post facto* manner.

■■ In *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), the U.S. Supreme Court first recognized the prohibition of *ex post facto* laws and defined them to include laws criminalizing conduct that occurred before enactment of the statute, but also "[e]very law that aggravates a crime, or makes it greater than it was, when committed" and "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* at 390. "The standard for determining whether a law violates the *ex post facto* prohibition is two-part. First, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; second, the law 'must disadvantage the offender affected by it.' " *Purvis v. Commonwealth,* 14 S.W.3d 21, 23 (Ky.2000) (quoting *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 67

L.Ed.2d 17 (1981)). A law is retrospective if it "changes the legal consequences of acts completed before its effective date." *Weaver*, 450 U.S. at 31, 101 S.Ct. 960.

Here, the jury was able to consider Appellant's conduct that occurred prior to the amendment to KRS 530.020 increasing the penalty for incest in some instances. The jury could have unanimously agreed that such conduct occurred prior to the amendment as grounds for Appellant's conviction. In that situation, Appellant could have only been convicted of Class C incest. On the other hand, the jury could have unanimously agreed that Appellant's conduct occurred after amendment, allowing conviction for a Class B incest offense.

■ Appellant's case, however, does not present the typical situation in which a law is challenged *on its face* as an *ex post facto* violation because the law expressly retrospectively increases the penalty for conduct committed prior to its enactment, or retroactively criminalizes noncriminal pre-enactment conduct. Rather, the issue here is whether KRS 530.020 *as applied* specifically to Appellant, presents an *ex post facto* violation.

It is true that the application of the amended statute to pre-amendment behavior implicates *ex post facto* principles, but it technically can only violate the Due Process Clause. In *United States v. Marcus*, 560 U.S. 258, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010), the Supreme Court recently held that retroactive judicial application of a statute can violate due process, but is not a direct violation of the Ex Post Facto Clause, even though the principles are functionally the same. In *Marcus*, the Court considered convictions in U.S. district court of violating the Trafficking Victims Protection Act of 2000 ("TVPA"), a federal "course of conduct" statute criminalizing forced labor and sex trafficking. The trial court's jury instructions in that case included the time frame of "January 1999 and October 2001," but the TVPA only became effective on October 28, 2000, which fell within the middle of the time frame of the jury instruction. Marcus appealed his conviction on the ground that it violated the Ex Post Facto Clause of the U.S. Constitution and that the violation was "plain error" even though he never objected at trial. The Second Circuit reversed, holding that the conviction violated the Ex Post Facto clause, which was "plain error."

The United States Supreme Court reversed, holding that the Second Circuit misapplied the "plain error" standard. Importantly, the Court also noted that the violation in question was not an *ex post facto* violation because the federal statute did not "retroactively criminalize[ ] pre-enactment conduct." *Id.* at 2165. The Court held instead that "if the jury, which was not instructed about the TVPA's enactment date, erroneously convicted Marcus based exclusively on noncriminal, pre-enactment conduct, Marcus would have a valid *due process* claim." *Id.* (emphasis added). Thus, the Court remanded the case to properly apply the plain error rule to what was instead a potential due process error.

The Court's reclassification of Marcus's claim as a potential due process violation rather than an *ex post facto* violation comports with its previous jurisprudence and the language of the *ex post facto* clauses themselves, which apply only to Congress or the state legislatures. In *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), the Court noted that "[t]he Ex Post Facto Clause is a limitation upon the powers of the Legislature and does not of its own force apply to the Judicial Branch of government." *Id.* at 191, 97 S.Ct. 990. The Court noted, however, that "the principle on which the

Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty" and "[a]s such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment." *Id.* at 191–92, 97 S.Ct. 990. The implication of these statements is that, despite labeling this type of error a due process violation rather than an *ex post facto* violation, the Court expressly considers *ex post facto* principles to apply to the retrospective application *by the judiciary* to criminalize behavior that was not criminal at the time or to elevate the penalty for previously criminalized behavior.

Read together these cases make clear that while true *ex post facto* violations are limited to expressly retroactive criminal statutes, the retroactive application of a criminal statute by a court can nevertheless violate the constitution. We simply call it a due process violation instead.

■ The question, then, is whether Appellant's claim, when reclassified as a due process violation, amounts to palpable error, since there was no objection at trial. The Supreme Court expressed suspicion that the error in *Marcus* could be "plain error," which is the federal analog to our palpable error rule. In *Marcus,* the Supreme Court noted the difference between statutes that criminalize individual acts, such as incest in Kentucky, and statutes that criminalize a "course of conduct," such as the TVPA. The Court cited approvingly *United States v. Harris,* 79 F.3d 223 (2d Cir.1996), for the proposition that "when a statute is concerned with a continuing offense," *id.* at 229, "[t]he Constitution … does not forbid the application of a new statute to such a course of conduct so long as the conduct continued *after* the enactment of the statute." *Marcus,* 130 S.Ct. at 2163.

Consequently, the Court determined that it would have been extremely unlikely that a jury tasked with examining a defendant's nearly three-year course of conduct would have found that all of the defendant's criminal conduct occurred preenactment, so as to affect Marcus's "substantial rights" or "necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 2165–66 (citations omitted). For that reason, the Court remanded the case to the Second Circuit to decide whether, in fact, Marcus had shown a plain error when his claim was reclassified as a due process one.

Unlike in *Marcus,* the Appellant in this case was not convicted under a "course of conduct" statutory paradigm. Instead, KRS 530.020 criminalizes an individual act of incest, not a course of incestuous conduct. To convict under the statute, a jury must unanimously find that a specific individual act occurred. Unlike "course of conduct" crimes, a jury convicting on an "individual act" crime may not look at the Appellant's overall behavior over the course of a few years in order to determine whether a crime occurred.

This obvious distinction is bolstered by looking at what the Second Circuit held on remand in *United States v. Marcus,* 628 F.3d 36 (2d Cir.2010). On remand, there was no question that application of the TVPA to preenactment conduct was a due process violation; the only question was whether it was plain error. The court specifically noted the difference between Marcus's forced labor conviction and his sex trafficking conviction under different provisions of the TVPA.

The court upheld Marcus's forced labor conviction because his conduct as to that offense was substantially similar both before and after the enactment of the TVPA.

The court concluded that there was little chance that the jury differentiated between the pre- and post-enactment conduct or that it might have acquitted Marcus had the instruction only covered post-enactment conduct. *Id.* at 43.

On the other hand, Marcus's conviction for sex trafficking was based on evidence of three different types of criminalized acts—harboring, recruiting, and transporting—some of which occurred before the statute's enactment and some after. Specifically, he recruited the sex workers prior to the enactment, but harbored them and transported them at the time of the enactment and afterward. *Id.* at 43–44. The court reversed this conviction because "the conduct supporting the sex trafficking charge differed materially before and after [enactment of the statute], such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings." *Id.* at 44.[2] This made it plain error.

Like in *Marcus*, there is no question that Appellant's due process rights were violated by applying the Class B felony sentence to a conviction under a jury instruction that covered behavior both before and after the amendment of the statute. Moreover, like in *Marcus* on remand to the Second Circuit, the error was necessarily palpable. While this Court's rule focuses on palpable error, it has held that the standard is similar to the federal plain error rule. *See Martin v. Commonwealth,* 207 S.W.3d 1, 3–4 (Ky.2006). As noted above, the jury in Appellant's case was able to consider specific acts during an almost one-year time period prior to the amendment to KRS 530.020 in its decision

to convict Appellant of incest. Thus, the jury was permitted to examine conduct that at that time would not have amounted to Class B incest to determine whether Appellant was guilty of Class B incest against M.P. The discrete criminal acts of incest shown by the proof in this case were analogous to the different types of criminal conduct in *Marcus.* While the conduct here did not differ substantially before and after the amendment, incest is not a course of conduct offense but is instead an act offense. There is a reasonable probability that the result, on sentencing, would have been different if the jury had been properly instructed because it very well could have convicted Appellant only of an offense that pre-dated the amendment.

The Court holds that this clearly violated Appellant's due process rights, and that such violations were palpable error because they affected Appellant's substantial rights and resulted in a "manifest injustice." RCr 10.26. This, however, is not to say that Appellant's convictions themselves are flawed. Unlike in *Marcus,* his behavior was criminalized before the 2006 amendment. Instead, only the penalty was increased when the jury finds an additional element—that the victim was under age 18—that was not described before the amendment of the statute. Here the jury found the elements of the offense under the pre-amendment version of the statute, which is sufficient to sustain the conviction. The error goes only to the sentence, where Appellant was sentenced as a Class B felon. Appellant could have only been convicted for two counts of Class C incest against victim M.P., and his case is remanded for resentencing consistent with this finding.[3]

---

2. Additionally, the government conceded that it was plain error.

3. This Court has applied this approach in an unpublished opinion, *Steitz v. Commonwealth,* 2008–SC–000108–MR, 2009 WL 3526655, *4 (Ky. Oct. 29, 2009). While it is therefore not

The outcome the Court has reached on this issue might have been different had Appellant been convicted of a "course of conduct" crime rather than one that only criminalizes an individual criminal act. Some states have enacted "course of conduct" statutes for sexual abuse cases. *See, e.g.,* Md. Criminal Law Code Ann. § 3–315 ("(a) Prohibited.-A person may not engage in a continuing course of conduct which includes three or more acts that would constitute violations ... with a victim who is under the age of 14 years at any time during the course of conduct."), but Kentucky has not. Until our legislature enacts a similar "course of conduct" statutory scheme for such crimes, due process prohibits a jury from considering conduct that occurred at a time in which a statute was not in place in order to convict or increase the punishment pursuant to that very statute.

### 2. Wrong Penalty Range

■ Appellant also claims that the trial court exceeded the permissible consecutive sentencing range by sentencing him to a 70–year term of imprisonment. This argument turns on his claim that none of his convictions were proper for a Class B felony.

When the trial court sentenced Appellant, it treated all three of his incest counts, two against M.P. and one against C.P., as Class B felonies, which would make the maximum consecutive sentence 70 years. *See* KRS 532.110(1)(c). But, he notes, the jury was instructed only as to incest as a Class C felony because the guilt-phase instructions tracked the pre–2006 version of the statute, which did not require finding that the victim was under age 18. He notes that, in fact, the incest jury instructions were based on Class C model jury instructions from 1 William S. Cooper & Donald P. Cetrulo, *Kentucky Instructions to Juries (Criminal)* §§ 8.99, 8.99A (5th ed.2006). Thus, according to Appellant, he was actually convicted of three counts of *Class C* incest, meaning all of his convictions would have been for Class C or lesser felonies.[4] Appellant argues that this means the maximum sentence that he may receive is 20 years. If he is correct that his convictions were proper only for Class C felonies, then he is also correct that his maximum consecutive sentence was 20 years. *See* KRS 532.110(1)(c); KRS 532.080; *see also Commonwealth v. Stambaugh,* 327 S.W.3d 435, 438 (Ky.2010).

Because Appellant did not object to these instructions at trial, they are unpreserved and this Court would ordinarily review them only for "palpable error."

binding, it is nevertheless persuasive. In that case, the Court considered this precise issue for the first and only time. The indictment contained a specific date that was after a 2006 amendment to KRS 531.335 that increased possession of matter portraying a minor in a sexual performance from a misdemeanor to a felony. The jury instruction, however, included a date range from August 2005 (11 months prior to the amendment) to August 2006 (one month after the amendment). The Court recognized this as an *ex post facto* violation, and cited no authority as if to suggest that the answer was obvious. The Court had remanded the case for retrial on a separate juror issue, but noted that on retrial the jury instruction should be changed to include the specific date stated in the indictment rather than the date range. Thus, while the Court technically misclassified the constitutional violation as a direct *ex post facto* violation rather than a due process violation, it undeniably recognized that such a retrospective application of an amended version of a statute is a constitutional violation.

4. If Appellant were correct, he would have been convicted of Class C felonies for each incest count and one Second–Degree Rape count, and Class D felonies for Third–Degree Rape and Third–Degree Sodomy.

RCr 10.26. Again, however, sentencing errors may be reviewed on appeal even when insufficiently raised at the trial court. *See Jones,* 382 S.W.3d at 27; *Wellman,* 694 S.W.2d at 698.

Appellant is correct that none of the three jury instructions on their face required the jury to find that M.P. or C.P. was under the age of eighteen. As to M.P., the jury instructions required only that the act occurred between January 1, 2005 and November 30, 2007,[5] that M.P. was Appellant's stepdaughter at the time, and that Appellant knew M.P. was his stepdaughter. As to the other victim C.P., the jury instruction required the jury to find that the act occurred between July 11, 2007 and November 30, 2007.

Appellant's contention is that the jury instructions as to all three counts of incest did not require the jury to find that the victims were under the age of eighteen, a necessary element for Class B felony incest. Because the *ex post facto* and due process discussion above resolves two of these convictions as Class C felonies and requires resentencing with respect to them, this argument really only applies to the remaining conviction for incest against C.P.

This Court has previously held that "criminal convictions must rest upon a jury determination that the defendant is guilty of each and every element of the crime with which he is charged." *Thacker v. Commonwealth,* 194 S.W.3d 287, 290 (Ky. 2006) (citing *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); *see also Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be sub-

mitted to a jury, and proved beyond a reasonable doubt."); *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding jury is entitled to decide the entire essential element, including the application of law to fact). The Court has deemed this requirement of paramount importance to the principles of due process.

■■■ An erroneous instruction that omits an element of the offense, however, is subject to harmless-error analysis. The omission of an element is no different than misdescribing an element, *id.* at 12, 119 S.Ct. 1827, and "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," *id.* at 9, 119 S.Ct. 1827. This Court has adopted the *Neder* approach to missing elements in jury instructions. *See Wright v. Commonwealth,* 239 S.W.3d 63, 66 (Ky.2007) (citing *Neder,* 527 U.S. at 12–13, 119 S.Ct. 1827); *Meece v. Commonwealth,* 348 S.W.3d 627 (Ky.2011).

■■■ The test, then, "is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder,* 527 U.S. at 15, 119 S.Ct. 1827 (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). As applied to this scenario, we have stated that "[a]s long as it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty' an actual jury finding on that element is not mandated and an appellate court can find the error harmless." *Wright,* 239 S.W.3d at 66. However, "[a] reviewing court making this harmless-error inquiry does not … 'become in effect a second jury to determine whether the defendant is guilty.'" *Neder,* 527 U.S. at

---

5. In fact, the two jury instructions as to M.P. were identical, except that Instruction No. 6 added the distinguishing characteristic of "de- viate sexual intercourse" rather than only "sexual intercourse" as in Instruction No. 5.

18, 119 S.Ct. 1827 (quoting Roger Traynor, *The Riddle of Harmless Error* 21 (1970)). "Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id.* In other words, if the proof would rationally lead the jury to find that the element did not exist, then we cannot be sure that the omission of the element from the instructions did not contribute to the verdict.

Appellant concedes that the only element missing from each incest instruction was the age of the victims. But there is no question that omission of that element was error as to the incest jury instruction covering C.P. We continue to caution the bench and bar that trial error such as this one should be avoided. Indeed, we have previously suggested that future instances of this type of error may not be subject to application of the harmless-error doctrine because it tempts courts "to continue a practice this Court has previously condemned as error." *Meece,* 348 S.W.3d at 718. Despite this concern, however, the Court finds the error to be harmless in this case because the jury made a finding of C.P.'s age in another, proper jury instruction.

Appellant was convicted of second-degree rape as to C.P. That instruction contained the exact same date range ("between July 11, 2007 and November 30, 2007") as the incest instruction. The second-degree rape instruction also required the jury to find that at the time of the sexual intercourse, during that date range, "[C.P.] was less than 14 years of age." The jury found Appellant guilty under this instruction. Thus, it is clear that *this jury* was convinced that C.P. was not only less than 18 years old but that she was less than 14 years old during that period in which the incest was committed.

While generally a jury must decide each element of the crime, in this case the failure of the jury to do so was harmless beyond a reasonable doubt. Given the jury's finding under the second-degree rape instruction, it would not have reached a different conclusion under the incest instruction, even if the additional element had been included. Thus, we are sure, beyond a reasonable doubt, that the error did not contribute to the verdict. Of course, had Appellant only been convicted of incest and had the jury not already determined that C.P. was less than 18 years old during that date range, we cannot say that the error would have been harmless. But because that was not the case here, the error was harmless, and thus it could not be palpable, and Appellant's conviction for incest as a Class B felony as to C.P. is affirmed.

### C. Costs

In its final judgment the trial court assessed court costs of $155 and a partial public defender fee of $200, with both financial obligations to be reviewed upon Appellant's release from prison. Appellant claims that the trial court erred in levying both court costs and partial public defender fees because he was judged to be a "poor person" pursuant to KRS 453.190 and KRS 31.110(2)(b). Moreover, Appellant claims that the trial court erred in retaining jurisdiction to review such costs and fees upon Appellant's release;

▮▮▮▮ The Court recently resolved the continuing jurisdiction issue in *Buster v. Commonwealth,* 381 S.W.3d 294 (Ky.2012). In that case, the trial court had levied $200 in a partial public defender fee, but had retained jurisdiction to review the appellant's ability to pay that fee and whether to levy court costs until his release. This Court held, as to the court costs, that

the decision to impose or waive court costs is to be made by the trial court by or at the time of sentencing. There is no statutory basis for a court to exercise jurisdiction to determine the appropriateness of court costs beyond the end of the proceedings, much less once the sentence has been imposed and served and the defendant has been released from prison.

*Id.* at 305. Thus, the determination of whether a person is a "poor person" for the purpose of court costs and whether a partial public defender fee is to be assessed must be made at the time of sentencing, and the court cannot reserve for itself jurisdiction to review those costs beyond ten days after judgment. *Id.* at 304. Because the trial court did not retain jurisdiction until Appellant's release, we therefore reverse the portion of the trial court's judgment purporting to retain jurisdiction to reassess court costs and fees in the future.

 The only remaining question is whether the assessment of costs and the public-defender fee at all was error and whether this case needs to be remanded for further proceedings on this issue.

The difference between Appellant's case and *Buster* was that the trial court in *Buster* did not determine court costs at all, deciding instead to put off that determination and the question of whether Buster was a "poor person" until his release. Because the Court found that the determination of court costs and partial public defender fees[6] was mandatory, the Court

remanded the case to determine whether or not to levy such costs and fees.

Here, however, the trial court levied both court costs and partial public-defender fees in its final judgment. Appellant correctly notes, however, that the trial court entered an order immediately following its final judgment allowing Appellant to proceed *in forma pauperis* on appeal in which the trial court expressly stated that Appellant was a "poor person" for purposes of KRS 453.190 and KRS 31.110. Because a determination was already made at the time of the entry of the final judgment, or immediately thereafter,[7] that Appellant was a "poor person" and was therefore not able to pay costs, the Court need not remand Appellant's case to the trial court for a determination of court costs. A statutory "poor person" is not subject to court costs. KRS 23A.205; *Maynes v. Commonwealth*, 361 S.W.3d 922, 929 (Ky.2012). Because Appellant was such a poor person at the time of sentencing, as found by the trial court, the portion of the judgment imposing those costs is vacated.

Questions regarding entitlement to a public defender and payment of partial public defender fees are determined under a slightly different standard from the "poor person" definition. *Maynes*, 361 S.W.3d at 929. Specifically, a defendant is entitled to a public defender when he is indigent or a "needy person" under KRS 31.110, and a partial fee can be assessed if the needy person is nevertheless "able to pay." KRS 31.211(1). But a person can

---

**6.** The Court noted that "while the fee is not mandatory, the determination whether the defendant can pay the fee is, and if the person can pay the fee, then '[t]he court shall order payment in an amount determined by the court and may order that the payment be made in a lump sum or by installment payments to recover money for representation provided under this chapter.'" *Buster*, 381

S.W.3d at 306 (quoting KRS 31.211(1), (alteration in original)).

**7.** Appellant argues that the trial court granted the motion to appeal *in forma pauperis*, and thus made the determination that he was a "poor person," two minutes after entering the final judgment.

be a "needy person" without being a "poor person." *Maynes,* 361 S.W.3d at 929 ("[A] person may qualify as 'needy' under KRS 31.110 because he cannot afford the services of an attorney yet not be 'poor' under KRS 23A.205 ... unless he is also unable to pay court costs without 'depriving himself or his dependents of the necessities of life, including food, shelter or clothing).'" (quoting KRS 453.190(3)).

However, it does not appear that a person can be "poor" under KRS 43.190 but nevertheless "able to pay a partial fee for legal representation." KRS 31.211(1). A "poor person" is one "who is unable to pay the costs and fees of the proceeding in which he is involved without depriving himself or his dependents of the necessities of life, including food, shelter, or clothing." KRS 453.190(2). A person who cannot pay court costs surely cannot pay a partial public defender fee. Thus, because Appellant was found to be a poor person, the partial public defender fee was improperly assessed under KRS 31.211(1), and the imposition of that fee must also be vacated.

### III. Conclusion

The Court hereby affirms Appellant's convictions, but remands to the trial court for resentencing on Appellant's incest convictions as to victim M.P. consistent with this opinion. Additionally, the Court vacates all court costs and the partial public-defender fee.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCOTT and VENTERS, JJ., sitting. All concur.