# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0098-MR

ANTONIO TYREE GASKIN                                                                          APPELLANT

V.
ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. TRAVIS, JUDGE
NO. 20-CR-00180

COMMONWEALTH OF KENTUCKY                                                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Antonio Gaskin was convicted following a jury trial in Fayette Circuit Court of two counts of murder and two counts of failure of a person to report a death. Upon receiving a sentence of life imprisonment, he now appeals as a matter of right.[1] Following a careful review, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Just before 11 a.m. on the morning of October 16, 2019, an anonymous caller informed the Lexington Police Department ("LPD") that a person or persons may have been shot inside an apartment on Alexandria Drive in Lexington, Kentucky. Responding officers made entry into the apartment where they located the bodies of Marquis Harris and Sharmaine Carter in the

---

[1] KY. CONST. § 110(2)(b).

kitchen.  Both had been shot multiple times in the head and chest.  Harris was wearing a backpack and had a travel pillow around his neck.

Further investigation revealed the apartment was rented to Harris and was likely used as a location to traffic narcotics.  The front door had been fitted with a mechanism by which a 2x4 wood plank could be installed and locked into place as a barricade.  Officers located a security camera in a back bedroom, and it appeared another had been removed from the kitchen above where the bodies were found.  Several items were collected from the scene which were sent for fingerprint analysis and DNA testing.  Gaskin's fingerprints were found on a Sprite can and Solo cup while his DNA was present on the same Sprite can and a cigarette butt.

In the first few hours of the investigation, LPD officers obtained cellphone records revealing Gaskin's phone was at the apartment on the night of October 15.  Officers discovered Harris called Gaskin at 9:05 p.m. and 9:09 p.m. that night.  The latter call was the last activity on Harris's phone.  Carter's final call was to Harris at 7:46 p.m.  Video surveillance from a neighboring business showed a white passenger car pulling up in front of the apartment at approximately 9:10 p.m. that evening and two figures moving around it.  No positive identification could be made of either of the individuals based on the distance of the vehicle from the camera's location.

The day after the bodies were discovered, police were contacted by George Heard who had seen news coverage of the murders.  Heard told officers he was a Lyft driver who also provided his driving services outside the

2

parameters of his usual work as a "side gig." He had given Harris rides on several previous occasions. Heard said he had picked Harris up in Detroit, Michigan, and driven him back to the Alexandria drive apartment on October 15. He recalled Harris was traveling with a backpack and routinely wore a neck pillow on long car rides. Upon arriving at the apartment, Harris was short on the fare, so he called someone to bring him the remaining $50. A man came to the car and handed Heard the cash before walking with Harris back to the apartment. Heard would later identify Gaskin as the man who paid him after being shown a single photograph by the investigating officer.

Around this same time, LPD received an anonymous tip that Gaskin was responsible for the murders, prompting a search for connections between Gaskin and the victims. Detectives obtained search warrants for cellphone records and were able to locate an individual who occasionally gave Gaskin rides in exchange for favors, commonly in the form of drugs. He indicated he knew Gaskin and Harris and that he had dropped Gaskin off at the Alexandria Drive apartments on October 15 between 8:50 p.m. and 9:00 p.m. Gaskin called him back at around 9:20 p.m. but he did not answer. Additional searches of Gaskin's cellphone records and more in-depth investigation revealed he had contacted a taxicab service on October 16 seeking a ride from the Greyhound bus station in Cincinnati back to Lexington. The driver took Gaskin to the apartment where Harris and Carter were found later that morning. Gaskin went into and out of the apartment several times and appeared to be putting things in his pockets.

Sometime in the morning hours of October 16, Gaskin contacted Harris's mother and told her she should get the family together and travel to Lexington. Shortly thereafter, Harris's sister called Gaskin and he informed her Harris and Carter were dead. Gaskin was asked to contact police to report the deaths, but he refused. Another family member made the anonymous call to LPD which was received at 10:55 a.m. At some later time, Gaskin told Harris's family members he had entered the apartment and found the dead bodies.

Gaskin was subsequently indicted for two counts of murder, two counts of failure of a person to report a death, and being a persistent felony offender in the second degree (PFO II). A five-day jury trial commenced on July 18, 2021. During the guilt phase, the Commonwealth called eighteen witnesses and Gaskin called six; almost seventy exhibits were entered into the record. The jury convicted Gaskin on the charges of murder and failure to report a death and recommended a sentence of life imprisonment.[2] This appeal followed.

## II. ANALYSIS

Gaskin raises several assignments of error in seeking reversal. First, he contends the trial court erroneously denied his pretrial motion to suppress the out-of-court identification by Heard as unduly suggestive and lacking in reliability. Second, Gaskin contends the Commonwealth was improperly permitted to present rebuttal testimony from a witness who had not been separated and had been in the courtroom during testimony by other witnesses

---

[2] Prior to sentencing, the Commonwealth moved to dismiss the PFO II charge. The jury was not charged to consider sentencing on the misdemeanor offenses.

4

in violation of KRE[3] 615. Third, he alleges the Commonwealth engaged in prosecutorial misconduct during closing arguments by violating multiple pretrial rulings. Finally, Gaskin seeks reversal under the cumulative error doctrine.

### A. Suppression of the out-of court identification was unwarranted.

The day after the murders, Heard contacted police and provided information about occurrences close in time to the murder, specifically that he had dropped Harris off at the apartment and an African American man whom he had seen before had come out of the apartment to pay a portion of the fare for Harris's trip to Lexington from Detroit because Harris was short on cash. Approximately twenty-eight days later, Heard gave a video-recorded interview with investigators in which he reiterated the information he had previously provided. During the interview, Heard was shown a single photograph and asked if it looked like the man who had paid him the $50 on the night of the murders. Heard indicated the photograph "looked like him" and he had seen the person who paid him "once or twice" before.

Prior to trial, Gaskin moved to suppress Heard's out-of-court identification of him, asserting the procedure used by police was unduly suggestive and the identification was otherwise unreliable. He argued the encounter on the night of the murders was brief and nothing about the circumstances of a simple money exchange would trigger a heightened need for

---

[3] Kentucky Rules of Evidence.

attention to detail. Gaskin highlighted the fact that Heard's initial description of the man he saw was generic and vague, and he expressed no level of certainty at the time he was shown the single photograph. He also contended the nearly-month-long delay before the identification, when coupled with the inherently suggestive nature of the police procedure used, made his out-of-court identification unreliable. Following a suppression hearing, the trial court issued a six-page order wherein it determined the single-photo procedure "may have been unnecessarily suggestive" but concluded the totality of the circumstances rendered the identification reliable and suppression was not required. Gaskin disagrees with that holding and now urges reversal.

A trial court's findings of fact on motions to suppress evidence are subject to the "clearly erroneous" standard of review. *Neil v. Biggers,* 409 U.S. 188, 199 (1972). Rulings on the admissibility of evidence are reviewed for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 576 (Ky. 2000). An abuse of discretion occurs when a "trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581 (citing *Commonwealth v. English,* 993 S.W.2d 941 (Ky. 1999)).

We employ a two-pronged test to determine whether identification testimony violates a defendant's due process rights. *Commonwealth v. Parker,* 409 S.W.3d 350, 352 (Ky. 2013) (stating "[t]he determination of whether identification testimony violates a defendant's due process rights involves a two-step process." (citations omitted)). The Court must first determine whether the procedure used for the identification was unnecessarily suggestive. *Perry v.*

6

*New Hampshire,* 565 U.S. 228, 238-39 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."). "If so, 'the identification may still be admissible if under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive.'" *Dillingham v. Commonwealth,* 995 S.W.2d 377, 383 (Ky. 1999) (quoting *Stewart v. Duckworth,* 93 F.3d 262, 265 (7th Cir. 1996)).

Heard's in-person identification was based on a single photograph, rather than the preferred methods of using photo arrays or "mug books" containing multiple photographs.

> This procedure is similar to a showup and is similarly received by the courts. . . . The most circumspect identification is where a single photo is presented. Where this occurs, courts assume suggestiveness and then inquire as to the totality of circumstances to see if the identification was otherwise reliable.

Leslie W. Abramson, 8 Ky. Prac., *Crim. Prac. & Proc.* § 20:24 (6th ed.). Although showup identifications are inherently suggestive, they may be necessary to "aid the police in either establishing probable cause or clearing a possible suspect." *Savage v. Commonwealth,* 920 S.W.2d 512, 513 (Ky. 1995). Here, because a showup procedure was utilized which is inherently circumspect, we conclude it was both suggestive and unnecessary. *See Sweatt v. Commonwealth,* 550 S.W.2d 520, 522 (Ky. 1977) (a showup is not a generally approved method of securing an identification).

Having concluded the identification procedure was suggestive, we turn to the second prong of the analysis to determine if Heard's identification was otherwise reliable. In *Neil,* the United States Supreme Court stated an out-of-court identification would not be held to violate due process if under the "'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199. Assessing the totality of the circumstances requires consideration of the five factors enumerated in *Neil.* Those factors are: 1) the opportunity of the witness to view the criminal; 2) the witness' degree of attention; 3) the accuracy of prior descriptions of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and confrontation. *Id.* at 199-200. Therefore, the emphasis in *Neil* was on the reliability of the identification itself.

> It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S. [377, 384 (1968)]. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in [*Foster v. California,* 394 U.S. 440 (1969)]. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as [*Stovall v. Denno,* 388 U.S. 293 (1967)] makes

> clear, the admission of evidence of a showup without
> more does not violate due process.

*Id.* at 198 (footnote omitted).  Furthermore, even if a suggestive and unnecessary procedure is utilized, "suppression of the resulting identification is not the inevitable consequence."  *Perry*, 565 U.S. at 239 (citing *Manson v. Brathwaite*, 432 U.S. 98, 112-13 (1977)).  Thus, an identification will be excluded on due process grounds only when "improper police conduct created a 'substantial likelihood of misidentification.'"  *Id.* (quoting *Neil*, 409 U.S. at 201).

Turning to the five totality of the circumstances factors, we conclude they weigh in favor of the reliability, and thus the admissibility, of Heard's identification.  The trial court found all five factors weighed in favor of reliability and we agree.  First, it is undisputed Heard had an opportunity to view an individual at the Alexandria Drive apartment complex.  He engaged in a hand-to-hand cash transaction at a distance of less than two feet under the illumination of streetlights.  Second, Heard was able to give a detailed account of the events of the evening and his attention would have been drawn to the person paying the remainder of the fare for which his passenger was short.  Third, although his initial description was somewhat vague, it was accurate, and he stated he had seen the individual on previous occasions.  Fourth, while he was not asked to give a precise level of confidence or certainty in his identification, Heard did not equivocate when stating the photograph looked like the man he saw the night of the murders.  Finally, the delay of thirty days

9

between the crime and the identification does not taint its overall reliability.[4] In *Neil,* the victim did not identify the perpetrator for seven months. 409 U.S. at 194-95. In *Beecham v. Commonwealth,* 594 S.W.2d 898, 899 (Ky. App. 1979), the Court of Appeals noted the five years between the offense and photographic identification was a "weak point" in the case, yet ultimately concluded the identification evidence was properly admitted. And in *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1103 (6th Cir. 1990), a delay of approximately one month was deemed "relatively short" and was not a negative factor in the reliability calculus.

Although the showup procedure was unduly suggestive, we hold that, under the five factors set out in *Neil,* the identification was nonetheless reliable. There is always a possibility of mistaken identity. But "[t]he accuracy of an identification, though it is based on memory and the senses alone, still lies within the inherent province of the jury to assess." *Stephens v. Commonwealth,* 489 S.W.2d 249, 252 (Ky. 1972) (quoting *Burton v. Commonwealth,* 442 S.W.2d 583, 585 (Ky. 1969)). Gaskin would only be denied due process if the "photographic identification procedure was so

---

[4] As Gaskin correctly notes, the trial court's suppression order erroneously found the delay to be less than forty-eight hours. However, the error was not brought to the trial court's attention for correction or modification. Almost all issues are subject to waiver from inaction or consent, even in a criminal case, and "[a] new theory of error cannot be raised for the first time on appeal." *Springer v. Commonwealth,* 998 S.W.2d 439, 446 (Ky. 1999). Furthermore, in spite of the trial court's erroneous finding, this Court "may affirm a correct result upon any ground supported by the record" even if the lower court "reaches its judgment for the wrong reason." *Wells v. Commonwealth,* 512 S.W.3d 720, 721-22 (Ky. 2017) (citing *Jarvis v. Commonwealth,* 960 S.W.2d 466, 469 (Ky. 1998)).

impermissibly suggestive as to give rise to the very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 385. No such likelihood was shown in this case. Thus, under the circumstances presented, we discern no abuse of discretion in the trial court admitting Heard's out-of-court identification of Gaskin and the evidence was properly allowed to go to the jury.

**B. No abuse of discretion occurred in allowing rebuttal testimony.**

Second, Gaskin asserts the trial court erroneously permitted the Commonwealth to present rebuttal testimony from Lance Collins who was in the gallery during testimony from other witnesses after a motion had been made under KRE 615 for separation of witnesses.[5] He contends the Commonwealth concealed knowledge of Collins to ambush the defense and resulted in undue prejudice.

On the third day of trial, a detective was cross-examined extensively by the defense about a death threat sent via text message to Carter approximately fourteen days prior to her murder. The detective did not recall ever seeing the message and admitted he was unaware of the identity of the sender, nor had he

---

[5] KRE 615 states:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion. This rule does not authorize exclusion of:

(1) A party who is a natural person;

(2) An officer or employee of a party which is not a natural person designated as its representative by its attorney; or

(3) A person whose presence is shown by a party to be essential to the presentation of the party's cause.

11

investigated the threat. The following morning, the Commonwealth informed the trial court and Gaskin that Collins had approached during the previous day's lunch recess and claimed to be the author of the threatening message. Collins was directed not to reenter the courtroom or have any contact with the victims' families. He was placed in an anteroom for the remainder of the day until the Commonwealth could interview him to determine whether he should be called in rebuttal. Gaskin raised no objection to the disclosure.

After Gaskin closed his case, the Commonwealth called Collins in rebuttal. He testified he was Carter's boyfriend in 2019 and had been present in the courtroom when the detective was asked about the threatening text message. Gaskin immediately objected to Collins testifying as his presence in the courtroom the previous day during the testimony of other witnesses constituted a violation of KRE 615. He argued that even an inadvertent violation of the rule requires exclusion of the offending witness's testimony. After hearing the parties' positions, the trial court concluded whether to allow Collins to testify was discretionary. Because he was previously unknown to all parties, his testimony would be limited to factual rebuttal, and neither party would gain an undue advantage or prejudice from his testimony, the trial court ruled Collins could testify.

Collins confirmed he had sent the threatening messages and stated he and Carter were merely "bickering" rather than actually fighting. He stated he was in Detroit, Michigan, at the time and was not in Lexington on the date of the murders. Collins stated he and Carter were back on good terms before her

12

death and denied any role in the killings. Gaskin asserts the violation of KRE 615 required all of Collins' testimony to be excluded. Alternatively, he contends the testimony should have been disallowed because Commonwealth acted in bad faith by concealing Collins' presence. We discern no error.

The purpose of separating witnesses is "to insure (sic) the integrity of the trial by denying a witness the opportunity to alter his testimony." *Reams v. Stutler,* 642 S.W.2d 586, 589 (Ky. 1982). "We have uniformly interpreted the separation rule as providing a trial judge broad discretion to permit or refuse to permit a witness to testify who has violated the rule and have refused to intervene in such matters except in cases where that discretion has been abused." *Jones v. Commonwealth,* 623 S.W.2d 226, 227 (Ky. 1981). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999). Further, an appellant must show he was prejudiced when a rebuttal witness was called after hearing other witnesses testify. As we have previously held, "a violation without prejudice would not entitle a party to any relief." *Smith v. Miller,* 127 S.W.3d 644, 647 (Ky. 2004).

Gaskin's defense relied in large part on attempting to show the investigation into the murders was superficial and incomplete, and in pointing the finger at an unknown alternate perpetrator. To further the defense, Gaskin introduced the threatening texts when cross-examining the investigating detective and keyed in on the fact that the sender was unknown to police

13

because of a failure to investigate.  Unbeknownst to anyone, Collins was in the gallery and recognized the texts as being his own.  As the trial court noted, until that point Collins "wasn't on anyone's radar" nor was there any indication he would be a potential witness.  Thus, the trial court concluded there was no "mischief" afoot and that permitting Collins to testify in rebuttal was appropriate under the specific circumstances presented.

Rebuttal testimony responds to something brought up in a defendant's case that the Commonwealth could not reasonably anticipate.  However, "[r]ebuttal does not offer a protective umbrella, under which prosecutors may lay in wait."  *Chestnut v. Commonwealth*, 250 S.W.3d 288, 297 (Ky. 2008).  Such was simply not the case here.  Nothing in the record supports a finding the Commonwealth acted in bad faith or willingly or knowingly concealed Collins' presence or potential testimony.  We discern no strategic violation of any rules by the Commonwealth or any attempt to surprise Gaskin with an undisclosed witness.  Collins was previously unknown to law enforcement or the Commonwealth, potentially due to the incomplete investigation as argued by Gaskin in his defense.  He was present in the courtroom of his own volition to watch the trial of the person accused of killing his former girlfriend.  It was not until the detective spoke of the threatening messages that he recognized them as his own and approached the Commonwealth to claim ownership.

To borrow an analogy used by our predecessor Court, "the appellants, having opened the book on the subject, were not in a position to complain when their adversaries sought to read other verses from the same chapter and

14

page." *Harris v. Thompson,* 497 S.W.2d 422, 430 (Ky. 1973). It was within the sound discretion of the trial court to allow Collins to testify in rebuttal. Gaskin attempted to cast blame on an unidentified person who had threatened Carter's life shortly before she was killed. Collins came forward to identify himself and explain the context of the threats. The threatening messages were clearly unflattering to him and placed his own credibility and potential culpability into question. There is nothing in the record to indicate Collins tailored his testimony after listening to other witnesses. Although there had been a technical violation of KRE 615 by Collins being present in the courtroom while other witnesses were testifying, we cannot say the trial court abused its substantial discretion in allowing his limited rebuttal testimony. *See Pilon v. Commonwealth,* 544 S.W.2d 228, 231 (Ky. 1976). Gaskin has shown no prejudice and is therefore entitled to no relief. *Smith,* 127 S.W.3d at 647.

**C. Commonwealth's closing argument did not constitute misconduct.**

Next, Gaskin contends the Commonwealth engaged in prosecutorial misconduct during closing argument. Specifically, he complains the Commonwealth, in violation of the trial court's explicit pretrial rulings, made improper inferences regarding his exact location based on cell tower data adduced at trial. He concedes this argument is unpreserved for appellate review and requests palpable error review pursuant to RCr[6] 10.26.

---

[6] Kentucky Rules of Criminal Procedure.

15

Although not properly preserved, a palpable error "affects the substantial rights of a party" and "relief may be granted upon a determination that manifest injustice has resulted" from the error. RCr 10.26. A palpable error must be "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). To obtain a reversal based on an alleged palpable error, a defendant must show the error was "shocking or jurisprudentially intolerable." *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky. 2006). "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5.

Prosecutorial misconduct has been defined as an "improper or illegal act . . . involving an attempt to . . . persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011) (citing *Black's Law Dictionary* (9th ed. 2009)). The misconduct can occur in a variety of forms, including improper closing argument. *Dickerson v. Commonwealth,* 485 S.W.3d 310, 329 (Ky. 2016) (citing *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010)). Any allegation of misconduct must be viewed in the context of the overall fairness of the trial. *Commonwealth v. McGorman,* 489 S.W.3d 731, 742 (Ky. 2016). For reversal to be justified, the prosecutorial misconduct must be "so serious as to render the entire trial unfair." *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004) (quoting *Stopher v. Commonwealth,* 57 S.W.3d 787, 805 (Ky. 2001)).

"If the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010). However, as occurred here, where the defendant raised no objection this Court "will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Id.* (citing *Barnes v. Commonwealth,* 91 S.W.3d 564 (Ky. 2002); *Partin v. Commonwealth,* 918 S.W.2d 219 (Ky. 1996)).

At a pretrial hearing, Gaskin raised concerns about his historical cellphone location evidence and its use at trial. He asserted the recent decision in *Torrence v. Commonwealth,* 603 S.W.3d 214 (Ky. 2020), operated to prohibit a police officer from testifying about a cellphone's specific location based solely on historical cell tower data. Gaskin argued officers could plot the locations of cell towers with which a phone was communicating but go no further. The trial court agreed and stated its expectation the Commonwealth would stay within the bounds of binding caselaw. In its ruling, the trial court noted it was the province of the jury to draw inferences from any testimony regarding the generalized and approximate location of Gaskin's phone based on a ping to a cell tower site. Officers could testify only to which tower his phone was communicating at a particular time and the general location of the tower itself. At trial, the trial court reminded the Commonwealth of its earlier ruling when the historical cell tower data testimony began. The Commonwealth ensured the testimony conformed to the trial court's rulings. Exhibits provided to the

jury showed the dates and times Gaskin's phone was communicating with a tower and where the particular tower was located.

During closing arguments, the Commonwealth referenced the historical cell tower location data testimony to show Gaskin's movements before and after the murders. Gaskin's phone primarily connected with two towers during that time period, one near a hotel where he had rented a room and the other near the Alexandria Drive apartment complex. The Commonwealth referenced other corroborating testimony and evidence to argue Gaskin was at the apartment when the two murders occurred. In urging reversal, Gaskin now contends these arguments went beyond the scope of the trial court's explicit limitations and the Commonwealth made improper inferences exceeding the bounds of witness testimony and argued facts not in evidence as to his exact location. He asserts this equated to prosecutorial misconduct. We disagree.

"[P]rosecutors are allowed wide latitude during closing arguments and may comment upon the evidence presented." *Maxie v. Commonwealth*, 82 S.W.3d 860, 866 (Ky. 2002) (citing *Derossett v. Commonwealth*, 867 S.W.2d 195 (Ky. 1993); *Houston v. Commonwealth*, 641 S.W.2d 42 (Ky. App. 1982)). Such latitude is allowed during closing arguments because argument is not evidence. *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987). As previously stated, in the absence of a contemporaneous objection, we will only reverse if flagrant misconduct rendered the entire trial fundamentally unfair. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016). To determine whether improper comments amount to flagrant prosecutorial misconduct, we

18

must examine: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.* (quoting *Mayo v. Commonwealth*, 322 S.W.3d 41, 56 (Ky. 2010)).

Upon review of the Commonwealth's argument in full, we cannot conclude it mischaracterized the evidence or otherwise misled the jury. The Commonwealth reviewed the testimony regarding the cell tower location testimony and the maps produced from the raw data. It further referenced witness testimony which placed Gaskin at the apartment complex close in time to the murders to show that each corroborated the other. The Commonwealth then drew fair and reasonable inferences from all of the evidence to argue Gaskin was present when Harris and Carter were killed. During the Commonwealth's nearly forty-minute-long summation, less than four minutes was devoted to the cell tower location data and testimony. The three instances Gaskin references which he asserts crossed the line were fleeting at best and were certainly not extensive. Nor did the prosecutor specifically state the cell tower location information alone placed Gaskin in the apartment as he claims. The Commonwealth's argument tracked the evidence and fell within the bounds of reasonable inferences and comments on the evidence. No prosecutorial misconduct occurred.

**D. There was no cumulative error.**

Finally, Gaskin urges this Court to reverse his convictions under the cumulative error doctrine. We decline his invitation to do so.

The cumulative error doctrine provides that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citation omitted). In addition, "[w]here . . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citation omitted). A criminal defendant "is guaranteed a fair trial[,]" but "[t]his does not mean, however, a perfect trial, free of any and all errors." *McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). Having concluded a singular error occurred related to one finding by the trial court in its order denying Gaskin's suppression motion, we are confident such error lacked any prejudicial effect. "Although errors crept into this trial, as they inevitably do in a trial . . . they did not, either individually or cumulatively, render the trial unfair." *Brown*, 313 S.W.3d at 631. Gaskin is not entitled to the relief he seeks.

### III.    CONCLUSION

For the foregoing reasons, the judgment of conviction and sentence of the Fayette Circuit Court is affirmed.

All sitting. All concur. Thompson, J., concurs with separate opinion in which Conley, J., joins.

THOMPSON, J., CONCURRING: I write separately to emphasize that the presentation of a single photograph to Heard to identify Gaskin as the man who paid part of Harris's fare on the night of the murders was unduly suggestive, highly inappropriate, and violated police procedure. For more than forty years, it has been established that presenting a witness with a single photograph of a suspect for identification purposes is unduly prejudicial and suggestive. *Moore v. Commonwealth*, 569 S.W.2d 150, 153 (Ky. 1978). Standard police procedure dictates that a six-pack of similar photos be presented to the witness. *See Oakes v. Commonwealth*, 320 S.W.3d 50, 57-58 (Ky. 2010) (reviewing proper photo arrays). There is no reason that this standard procedure could not have been followed in this case, where Heard was interviewed by the police nearly a month after his initial report to police. The Commonwealth is very fortunate that in this particular case there was sufficient independent indicia of reliability to save Heard's later in-court identification of Gaskin and that, therefore, reversal of Gaskin's criminal conviction is not required based on this substantive misstep by the police.

Conley, J., joins.

21

COUNSEL FOR APPELLANT:

Jennifer Wade
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Thomas A. Van De Rostyne
Assistant Attorney General